MARKOVICH, Plaintiff-Appellant, v. McKESSON AND ROBBINS, INC., et., Defendant-Appellee.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24407. Decided April 2, 1958.

Lawrence E. Stewart, for plaintiff-appellant.
John R. Kistner, for defendant-appellee.

## OPINION

By SKEEL, PJ.

This appeal comes to this court from a judgment for the defendant entered on the verdict of a jury as directed by the court on defendant's motion for judgment at the conclusion of plaintiff's presentation of her evidence. The action is based on plaintiff's amended petition seeking damages, her first cause of action being in negligence in that defendant manufactured, sold and distributed a chemical product known as "Prom Home Permanent: which was alleged to be unfit and dangerous for human use when applied as directed, and in her second cause of action claiming damages by reason of a breach of warranty made in inducing the sale and use of such product.

It is alleged by the plaintiff that the defendant, Prom Cosmetics (a division of the Gillette Company), manufactures and sells a chemical compound known as "Prom Home Permanent." Plaintiff says that in selling or causing such preparation to be sold to plaintiff for her personal use and when applied as intended, the defendant warranted that

said product was of merchantable quality and fit to be used in the administration of a cold permanent wave and that it "was wholesome, safe and suitable under all circumstances."

The plaintiff alleges that on June 9, 1954, she purchased from the defendants a package of its "Prom Home Permanent" and used it in an attempt to administer a permanent wave to her hair. Plaintiff then alleges that she followed the directions furnished by the defendants but because such product was unwholesome, injurious, deleterious and unfit for human use, she, as a direct result of the carelessness and negligence of the defendants and by reason of their breach of warranty, which warranty induced the sale, suffered injury to her face and scalp and hair (her hair almost completely falling out).

The defendant, Prom Cosmetics, by answer, entered a general denial. The defendant, McKesson and Robbins, Inc., was dismissed from the case before trial.

The evidence introduced by the plaintiff tends to establish that the plaintiff was a patient of "Sunny Acres," a hospital then managed by the City of Cleveland, caring for patients suffering from tuberculosis. That quite some time prior to June 9, 1954, she had been subjected to a pneumotomy operation. Upon permission being given by the hospital authorities for the plaintiff to administer to herself a "home Permanent Wave," plaintiff, with the help of a nurses aide, shampooed her hair and then had the nurses aide purchase for her immediate use a "Prom Home Permanent" from the concession stand in the hospital. Her testimony on this part of her case was as follows:

"Q. You have indicated to us you received a shampoo; is that correct?

"A. Yes, sir.

"Q. Now, what, if anything, occurred after you had received the shampoo?

"A. Well, I asked Mr. (sic) Liggins if she would give me a home permanent and she told me I would have to get permission for that. She says, 'I will let you know.' So she came back later after she gave me the shampoo and she said that 'I got permission. It would be all right.' So she asked me what kind of permanent I wanted to get. So I told her I had been listening to Prom ads from my earphones and it seems to be the easiest one, won't have to go through all of that neutralizing, and everything, so I told her to get the hard to wave Prom. So when she came back she had gentle wave Prom. She told me they didn't have that one, so she says, 'I think maybe this one may be better for your hair anyway.' So I said, 'Okay,' and then we—* * *

"Now, what, if anything, occurred when Mrs. Liggins came back to your room with the Prom and the spin curlers?

"Well, we opened the box, it contained a bottle of lotion, some cotton, packages of papers, there may have been two little packages of papers and the direction sheet. So we started to read the directions. I was reading them out loud. She was looking over my shoulder. We read them several times. So I told her, 'You might as well take a test curl first and we will start on that,' because I always get a test curl in any beauty shop I have ever went first. So she took—"

The directions introduced into evidence contain, among other things, the following:

"Prom Home Permanent—Now—New Easier Method * 15 Minute Timing * Towel Turban Control.

"Prom leaves your hair in better condition than any other waving method because—

"A The clear water rinse removes any unused waving lotion from your hair.

"B Prom's new Self-Neutralizing is a gentler, more natural action— no separate neutralizer is needed!"

Both the plaintiff and the nurses aide testified that in applying the "Prom Home Permanent." they read the directions with great care and followed them explicitly. Two test curls were made with apparent success and then they completed the waving of plaintiff's hair, using all of the waving lotion in complete accord with the instructions. The plaintiff's hair was then covered with a towel, turban fashion, as directed. After waiting about six hours, the turban was removed and they attempted to remove the spin curlers. The plaintiff testified on this subject as follows:

"Q. And when the six hours had passed, what, if anything, occurred? What did you do?

"A. I removed the towel and I went over to the sink and I could see it wasn't dry, got scared, so I touched it, felt like melted rubber, something, so I took one curl out, so the hair pulled out of the curler and it looked like lye had eat it up, it was just stringy, that come out in strings, so I got exicted. I turned my light on, so Mrs. Trowbridge came down to my room and answered the light and when she came in she said, 'What's the matter?' So I am crying. By that time she gets a chair there. She said, 'Here, sit down in the chair.' She was as excited as I was almost, so she started taking the curlers out and the hair was all falling, then, in strings, melted, and in the sink and she was, in the meantime, trying to pour water over it, trying to get it out to see what is loose, what to do, so I still says, 'Don't let all my hair go through the sink.' I grabbed some of it, threw it up on the sink so I could save it, so she got through and they was a few strains here and there and the test curls that we had taken were hanging so she took the scissors, had to take scissors to get what was left off.

"* * *

"Incidentally, can you tell us whether or not there was any odor in connection with the Prom Home Permanent lotion? Yes; they were. It had a terrible odor like something burning. I know some permanents they do have an odor to them, but I never smelled one that bad. So bad a patient down the hall she thought the hospital was on fire. She smelled it all the way down to her room, about five doors down."

The nurse, referred to by the plaintiff, who helped to remove the spin curlers, corroborated in complete detail plaintiff's description of the results of the loss of her hair by the use of the defendants' "Prom Permanent" lotion.

There is no direct evidence in the record as to the chemical con-

tent of defendant's "Prom Permanent" wave preparation purchased by the plaintiff for the reason that it was all used as directed by the defendant's instructions contained in the box in which the lotion was packed. An expert witness (a medical doctor specializing in dermatology), testified with regard to a chemical ingredient (Thioglycolate) contained in the Prom Permanent Wave. This witness, after examining the patient's head and hair about November 12, 1954, testified:

"My diagnosis was that she sustained a contact dermatitis of the scalp, eyelids, forehead and ears due to the direct, irritating chemical. A contact dermatitis is a dermatitis or inflammation of the skin which results from coming in contact with something that inflames it or irritates it and we speak of these things as contact dermatitis. She also had an injury to the hair itself. One, that she actually had a chemical haircut. The chemical was applied to her hair and resulted in excessive softening of the hair so that when it dried it became brittle and broke, so she had a chemical haircut, actually. The hairs, were still there, just like short grass would be after cutting the lawn. Secondly, she had a quantitative loss of hair where the hair actually came out of her scalp. That was manifested by the fact that on tugging and pulling it brought out complete hairs, and you could see those little bulbs which I refer to as papilli and it was manifested by the fact that every time she combed her hair it came out. It is also manifested by the fact that her hair was obviously tight in certain areas as compared with the fact of her hair coming out through tugging, loads of hair."

This witness also testified, in answer to a hypothetical question describing in detail the plaintiff's use of "Prom" and the results that immediately followed the loss or breaking off of plaintiff's hair, as follows:

"I believe there is a direct causal relationship between the application of the chemical known as Prom to the events that followed, namely, a reaction on the hair by over-swelling resulting in its increasing brittleness and breaking off; that there is, further, an injury to the hair throughout its entire length, clear down to its papilla, resulting in a loss of hair on the scalp; and, thirdly, I believe there is a direct relationship between the application of this chemical, called Prom, and the inflammation that followed on the surface of the scalp, the skin involving the scalp, forehead, eyelids and behind the ears."

As indicated, the court at the conclusion of the plaintiff's case granted defendant's motion for judgment and dismissed plaintiff's petition at plaintiff's cost for which judgment was entered.

The plaintiff claims "The judgment is contrary to law in that the trial court erred in rendering final judgment against the plaintiff-appellant in favor of the defendant-appellee, on defendant-appellee's motion for a directed verdict at the conclusion of plaintiff's evidence."

If upon the face of the record, the plaintiff was by law entitled to have her case submitted to the jury on one or more of the claims pleaded, if supported by credible evidence, then the judgment must be reversed and the cause remanded.

The plaintiff's case is based first on negligence, second upon an express warranty, and third, upon an implied warranty.

As to the first of these claims, that is that the defendant was negligent in furnishing a product that could not be safely used in the manner and for the purposes intended, which failure on the part of the defendant was a proximate cause of plaintiff's injuries, the evidence is clearly sufficient to take the case to the jury. Almost the identical question was considered by the Supreme Court in the case of Sicard v. Kremer, 133 Oh St 291, 13 N. E. 2d 250, the first paragraph of the syllabus provides:

"1. Where, in an action against the distributor of a hair dye, inherently dangerous, by a purchaser thereof from a local dealer, the evidence shows that the purchaser, in using the hair dye according to directions contained in a leaflet accompanying it, proximately sustained both personal injuries and damages to her business as a beauty parlor operator, it is not error prejudicial to the defendant distributor for the trial court to submit the case to the jury on the issue of negligence."

And on page 294, the court said:

"In the sale of an article, the seller owes a duty beyond the mere contract. Not only must the goods be according to contract, but if used according to directions they must not carry harm to the buyer. In Clerk and Lindsell on Torts (9 Ed.), page 2, it is said: 'There may be a tort which arises out of breach of contract and yet is independent of it.' In the manufacture and sale of goods, the seller may not include therein, beyond the terms of the contract, anything which, unknown to the buyer, will cause the latter injury. This extra duty to refrain from including in the article any dangerous substance unknown to the buyer may be illustrated in the bestowal of a gift from one to another. Even though there be no purchase price, one has no right to bestow an article containing a hidden danger on another as a gift, knowing that the use thereof by such other will cause the latter injury. But where there is consideration, the responsibility to refrain from including in any such article any hidden danger is very much greater. There is the obligation that the goods will be fit for the particular purpose intended and the further duty to refrain from including therein any hidden danger unknown to the buyer. Failure to meet the first obligation is a breach of warranty, express or implied; failure to meet the second duty is negligence."

The second claim, of an express warranty, is also supported by credible evidence sufficient to require the case to be submitted to the jury on that issue. The plaintiff was induced to purchase "Prom Home Permanent" by defendant's radio broadcast, urging its use with the statement that a neutralizer other than water was unnecessary, making the application or use of its product much more convenient than those of other manufacturers. The product was purchased because of the warranties published by the defendant. The defendant induced the sale and is liable if the product thus bought does not comply with the representations made and the health of the user is endangered when the product is used as directed by the manufacturer.

The Supreme Court, affirming the Court of Appeals (77 Abs 249, 139 N. E. 2d 871) in the case of Rogers v. Toni Home Permanent Com-

pany, **167 Oh St 244**, 147 N. E. 2d 612, said in the third paragraph of the syllabus:

"3. Under modern merchandising practices, where the manufacturer of a product in his advertising makes representations as to the quality and merit of his product aimed directly at the ultimate consumer and urges the latter to purchase the product from a retailer, and such ultimate consumer does so in reliance on and pursuant to the inducements of the manufacturer and suffers harm in the use of such product by reason of deleterious ingredients therein, such ultimate consumer may maintain an action for damages immediately against the manufacturer on the basis of express warranty, notwithstanding that there is no direct contractual relationship between them."

The final claim of the plaintiff is that the evidence presented established a prima facie case of an implied warranty sufficient to require that question to be presented to the jury under proper instructions by the court. Let it be said at the very outset that, for the most part, an implied warranty is one imposed by law (which is equally true of an express warranty) to impel just results between parties. The Sales Code provides that where goods are sold by description, there is an implied warranty that the goods shall be of merchantable quality. Also, where the buyer makes known the purpose for which the goods are purchased and relies on the seller's skill or judgment to deliver goods reasonably fit for such purpose (§1315.16 R. C.), there is an implied warranty that the goods thus purchased are reasonably suitable for the purpose intended.

In Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 116, it is said:

"* * * But when the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture and was cognizant of any latent defect caused by such process and against which reasonable diligence might have guarded. This presumption is justified in part by the fact that the manufacturer or maker by his occupation holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use."

We recognize the fact that here the purchaser bought defendant's product from a sales stand maintained in a public hospital for the convenience of the patients and not directly from the manufacturer. It is true that the Supreme Court of Ohio has held in the case of **Wood v. General Electric Co., 159 Oh St 273**, 112 N. E. 2d 8, that, without privity,

the obligation of an implied warranty cannot be sustained. This rule was followed in **Welsh v. Ledyard, 167 Oh St 57**, 146 N. E. 2d 299, entirely on the authority of the Wood case, supra. But it is to be noted that in the case of Rogers v. Toni Home Permanent Company, supra, the court said, on page 249:

"Without commenting on the soundness of the holding in the Wood case, in the light of what has been stated above, suffice it to say that should a case come before this court with facts resembling those in the Wood case, it would then be time to re-examine and reappraise that decision."

Where an implied warranty is imposed by law, words of description used to identify the property which induced the sale, can hardly be distinguished from an express warranty as that term is defined by law, that is, a representation relied upon by the buyer which has the effect of inducing the sale. Under such circumstances where the obligations are imposed by law, it would be most difficult to distinguish between them in attempting to impose "privity" as a necessary element in making out a cause of action. Here the plaintiff ordered the defendant's product. The McKesson and Robbins, Inc., (the defendant dismissed from the case before trial) and the hospital were the only means by which defendant made its product available to the buyer. When she got delivery, defendant's product was in the original container and the lotion therein securely corked in a bottle. Neither McKesson and Robbins, Inc. nor the hospital made any representations that had the effect of inducing the sale.

The requirement of privity as a necessary element in the enforcement of a claimed warranty in a sales transaction cannot be understood unless considered in the light of the early development of the warranty obligation. First conceived of as an action in tort, the breach of the warranty representation, thus actionable, in no way qualified the buyer's duty to receive, pay for and keep the goods. The representations were held to be collateral to the bargain and until a seller directly, by collateral declaration of warranty, represented some particular quality in the goods, the doctrine of caveat emptor applied. From this beginning, the common law developed with the advance of the commercial needs of community life. The need for a collateral declaration was soon abandoned and courts' recognized that the provisions of the contract could be relied upon not only to support an action for breach of an express warranty but that a warranty could be implied from the circumstances and that an action on the contract, as well as in tort, was available. Williston, in his consideration of this question, in paragraph 197, at page 250, of his work on Sales, published in 1909, says:

"Much of the intrinsic difficulty and still more of the divergence of authority which characterize the law of warranty are due to an imperfect recognition of the nature of the obligation imposed by a warranty. As has been seen, the action upon a warranty was in its origin a pure action of tort. There is no doubt that to-day the obligation of a warrantor is generally conceived of as contractual, and there can be no doubt also that a seller may expressly promise to be answerable for some alleged quality of the articles sold, or that if he makes

such a promise for good consideration he enters into a contract. This, however, does not either upon authority or reason exhaust the possibilities of express warranties. It should not be the law, and by the weight of modern authority, it is not the law that a seller who by positive affirmation induces a buyer to enter into a bargain can escape from liability by denying that his affirmation was an offer to contract. A positive representation of fact is enough to render him liable. The distinction between warranty and representation which is important in some branches of the law is not appropriate here. The representation of fact which induces a bargain is a warranty. As an actual agreement to contract is not essential the obligation of the seller in such a case is one imposed by law as distinguished from one voluntarily assumed. It may be called an obligation either on a quasi-contract or a quasi-tort, because remedies appropriate to contract and also to tort are applicable. That this is the character of the seller's obligation was recognized by Blackstone, and that this point of view has been lost sight of by some courts is no doubt due to the fact that assumpsit became so generally the remedy for the enforcement of a warranty. But even at the present time an action of tort for warranty still lies irrespective of any fraud on the part of the seller or knowledge on his part that the representations constituting the warranty were untrue."

The so-called requirement of privity as a necessary element of an action for breach of warranty, declared during this period of the development of the common law of sales by the courts, found its justification in the fact that the promise, or representation, was, in fact, contained within or concerned with inducing the actual sales contract between the immediate parties. It was logically held that the promise or representation of the first seller became the property of the buyer dealing with him and to whom they were made, and that such promises or representations in no wise induced a sub-purchaser to buy the goods. Nor could it be considered that such first purchaser intended to assign to his sub-purchaser any of his rights acquired by his purchase from the original seller. Under these circumstances, the requirement of privity can be clearly understood. An express or implied warranty was not or even now could not be made out as a property right of a sub-purchaser in that kind of transaction. But even as conditions changed, a warranty, express or implied, continued to be an obligation imposed by law (not necessarily contractually assumed) and was available to an ultimate purchaser when the purchase was induced by the acts of the manufacturer or producer seeking to create a retail market for his goods where a middleman stocks the manufacturer's goods to meet the demands of the ultimate consumers. The ultimate buyer would not have become a purchaser of the subject of the sale had it not been for the representations of the manufacturer or producer made to the ultimate purchaser to induce his use of the product. If such representations are such (as requiring a purchase by description or for a particular purpose), the law would imply a warranty under the circumstances and such implied warranty becomes an obligation of the manufacturer or producer inducing the purchase.

Under the circumstances here presented, no distinction between establishing an express or implied warranty should be made. The plaintiff's case, based on implied warranty, should have been sustained for the consideration of the jury.

Judgment reversed and cause remanded for further proceedings according to law.

Exceptions noted. Order see journal.

HURD and KOVACHY, JJ, concur.