PHIPPS ETC. ET AL. *v.* GENERAL
MOTORS CORPORATION

[Misc. No. 6, September Term, 1975.]

*Decided September 29, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE and ELDRIDGE, JJ.

*Delverne A. Dressel,* with whom were *Dickerson, Nice, Sokol & Horn* on the brief, for appellants.

*Edward S. Digges, Jr.,* and *Francis B. Burch, Jr.,* with whom were *Joseph G. Finnerty, Jr.,* and *Piper & Marbury* and *Frazer F. Hilder,* General Counsel, on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

We are here presented with two questions of law certified to this Court by the United States District Court for the District of Maryland pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1974), § 12-601 *et seq.* of the Courts and Judicial Proceedings Article.

The plaintiff, James D. Phipps, an employee in the service department of Marbert Motors, Inc., of Annapolis, Maryland, was injured on November 1, 1972, when a 1972

Pontiac automobile which had been delivered to Marbert for servicing, and which Phipps was test driving in Annapolis, left the highway and crashed into a tree. A co-worker, Alexander F. Barchanowicz, who was a passenger in the automobile, was also injured.

James Phipps and his wife, Evalyn Phipps, instituted this action on October 31, 1975, in the United States District Court for the District of Maryland against the manufacturer of the automobile, General Motors Corporation. They alleged that the accident occurred when the accelerator of the automobile became stuck without warning, causing the automobile to accelerate suddenly at a high rate of speed and leave the road. It was further alleged that this malfunction of the automobile was caused by latent defects in the automobile's accelerator mechanism, in the carburetor and its components, and in the motor mounts.

The complaint contains six counts. In the first three counts, three separate causes of action are set forth. Count one alleges negligence in the design and manufacture of the automobile. Count two alleges breach of express and implied warranties. Count three alleges that the automobile was in a defective condition rendering it "not reasonably safe" when it left the control of the defendant and predicates liability upon the theory of strict liability in tort.[1] The final three counts of the complaint, in which James Phipps was joined by his wife, are each based upon the above theories respectively and seek damages for loss of consortium.

General Motors filed an answer to the complaint and also filed motions to dismiss both counts based upon the theory of strict liability in tort and the count seeking damages for loss of consortium caused by the alleged breach of warranty. In support of its motion to dismiss the strict liability counts, General Motors relied upon several prior cases of this Court which had declined, under the circumstances involved, to adopt the theory of strict liability in tort. General Motors argued that no such cause of action is recognized in this

1. Alexander Barchanowicz also filed an action in the United States District Court, containing virtually identical allegations as those in the first three counts of the Phipps complaint. That case was not certified to this Court, however.

State. As to the loss of consortium count, General Motors relied upon *Deems v. Western Maryland Ry.*, 247 Md. 95, 231 A. 2d 514 (1967), in contending that an action for loss of consortium is actually an action for damages to the marriage relationship and not for damages sustained by an individual. Since a seller's warranty extends only to a non-purchaser who is a "natural person" and who is "injured in person" under § 2-318 of the Maryland Uniform Commercial Code, Maryland Code (1975), § 2-318 of the Commercial Law Article, General Motors argued that no action for loss of consortium could be brought by a non-buyer as the marriage relationship was not a "natural person" who was "injured in person."

Phipps opposed both motions. Citing several trial court opinions, he argued that the courts of Maryland have recognized the theory of strict liability in cases where it would be applicable. Phipps also argued that a joint action for loss of consortium was proper where one spouse sustains bodily injury.

The United States District Court, finding that there were no controlling precedents in the decisions of this Court, certified the following two questions:

> "1. Do the third and sixth counts of the Complaint (alleging that the defendant manufactured and placed on the market an automobile in a defective condition which condition rendered the automobile not reasonably safe for its intended use) state causes of action under Maryland law by a person who allegedly sustained bodily injuries by reason of the defective condition?
>
> "2. Does the fifth count of the Complaint (alleging injury to a marital relationship by reason of breaches of express and implied warranties) state a cause of action under Maryland law?"

## (1)

The theory of strict liability is set forth in the Restatement (Second) of Torts § 402 A (1965):

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

As the Official Reporter's Notes to this section indicate, the rule stated in § 402 A was based upon a developing body of case law expanding the liability of manufacturers for injury caused by defective products. Early cases in several jurisdictions created an exception to the general rule that a supplier of chattels was not liable to a third person in the absence of negligence or privity of contract where food products were involved. Liability was generally premised upon an "implied warranty" which arose from the seller's representation in placing the food on the market that it was fit for human consumption. Although employing warranty language, the strict liability theory was essentially an action in tort dispensing with the traditional requirement of privity in contract actions. *E.g.*, *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 P. 633 (1913); *Coca-Cola Bottling Works v. Lyons*, 145 Miss. 876, 111 So. 305 (1927). Strict liability without privity was slowly extended to products other than food for human consumption, such as animal food, *McAfee v. Cargill, Inc.*, 121 F. Supp. 5 (S.D. Cal. 1954); *Midwest*

*Game Company v. M.F.A. Milling Company,* 320 S.W.2d 547 (Mo. 1959). Products involving intimate bodily use were brought within the strict liability rule, *e.g., Graham v. Bottenfield's Inc.,* 176 Kan. 68, 269 P. 2d 413 (1954) (hair dye); *Markovich v. McKesson & Robbins, Inc.,* 106 Ohio App. 265, 149 N.E.2d 181 (1958) (permanent wave solution). Finally, strict liability for defective products other than food or those involving intimate bodily contact was imposed without privity or a showing of negligence beyond the defect in the product. *Spence v. Three Rivers Builders & Masonry Supply,* 353 Mich. 120, 90 N.W.2d 873 (1958) (cinder building blocks); *Henningsen v. Bloomfield Motors, Inc.,* 32 N. J. 358, 161 A. 2d 69, 75 A.L.R.2d 1 (1960) (automobile); *Greenman v. Yuba Power Products, Inc.,* 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897, 13 A.L.R.3d 1049 (1962) (combination power tool). *Greenman* was the leading case expressly recognizing that the basis for strict liability for defective products was tort rather than contract. Justice Traynor there stated for the Supreme Court of California (377 P. 2d at 901):

> "Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law (see e.g., Graham v. Bottenfield's, Inc., 176 Kan. 68, 269 P.2d 413, 418; . . .), and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products (Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 84-96; . . .) make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products

unless those rules also serve the purposes for which such liability is imposed."[2]

Various justifications for imposing strict liability in tort on manufacturers have been advanced by the courts. It has been said that the cost of injuries caused by defective products should in equity be "borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves" and that "warranties serve this purpose fitfully at best." *Greenman v. Yuba Power Products, Inc., supra,* 377 P. 2d at 901. It has also been suggested that imposing strict liability on manufacturers for defective products is equitable because it shifts the risk of loss to those better able financially to bear the loss. *Seely v. White Motor Company,* 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145, 151 (1965). Another reason advanced is that a consumer relies upon the seller in expecting that a product is safe for the uses for which it has been marketed, and that this expectation is better fulfilled by the theory of strict liability than traditional negligence or warranty theories. *Markle v. Mulholland's, Inc.,* 265 Ore. 259, 509 P. 2d 529, 532-534 (1973). And still another reason advanced is that the requirement of proof of a defect rendering a product unreasonably dangerous is a sufficient showing of fault on the part of the seller to impose liability without placing an often impossible burden on the plaintiff of proving specific acts of negligence. *McCormack v. Hankscraft Company,* 278 Minn. 322, 154 N.W.2d 488, 500 (1967); *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55, 63 (1967).[3]

2. For a history of the theory of strict liability in tort *see* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn. L. Rev. 791 (1966); Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L. J. 1099 (1960); James, *Products Liability,* 34 Tex. L. Rev. 192 (1955); Noel, *Manufacturers of Products — The Drift Toward Strict Liability,* 24 Tenn. L. Rev. 963 (1957).

3. For a discussion of these reasons *see* Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts,* 70 Yale L. J. 499 (1961); Keeton, *Products Liability — Liability Without Fault and the Requirement of a Defect,* 41 Tex. L. Rev. 855 (1963); Shapo, *A Representational Theory of Consumer Protection: Doctrine, Function, and Legal Liability for Product Disappointment,* 60 Va. L. Rev. 1109 (1974).

The essential elements of an action in strict liability are set forth in § 402 A. For recovery, it must be established that (1) the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition. However, in an action founded on strict liability in tort, as opposed to a traditional negligence action, the plaintiff need not prove any specific act of negligence on the part of the seller. The relevant inquiry in a strict liability action focuses not on the conduct of the manufacturer but rather on the product itself. *See* Weinstein, Twerski, Piehler, Donaher, *Product Liability: An Interaction of Law and Technology*, 12 Duquesne L. Rev. 425, 429 (1974). Thus the standard to be applied in determining whether a product is defective becomes critical.

For a seller to be liable under § 402 A, the product must be both in a "defective condition" and "unreasonably dangerous" at the time that it is placed on the market by the seller. Both of these conditions are explained in the official comments in terms of consumer expectations. As Comment g explains, the requirement of a defective condition limits application of § 402 A to those situations where "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." An "unreasonably dangerous" product is defined in Comment i as one which is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

In those cases where the defect is a result of an error in the manufacturing process, that is where the product is in a condition not intended by the seller, there is less difficulty in applying the defectiveness test of § 402 A. *See* Frumer and Friedman, *Products Liability* § 16A[4] at pp. 3-318 — 3-320 (1976). Where, however, the alleged defect is the result of the design process so that the product causing injury was in a

condition intended by the manufacturer, the test has proved more difficult to apply. This difficulty has caused some courts and commentators to suggest that the theory of strict liability in tort is not really applicable in cases involving design defects as opposed to construction or manufacturing defects but rather that, analytically, traditional negligence standards still apply. *See Dorsey v. Yoder Company*, 331 F. Supp. 753, 759-760 (E.D. Pa. 1971), *aff'd*, 474 F. 2d 1339 (3d Cir. 1973); *Balido v. Improved Machinery, Inc.*, 29 Cal.App.3d 633, 105 Cal. Rptr. 890, 895 (1973); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L. J. 825, 836-838 (1973). The reasoning of these authorities is that in a design defect case the standard of defectiveness under § 402 A, involving as it does the element of unreasonable danger, still requires a weighing of the utility of risk inherent in the design against the magnitude of the risk.[4] *Cf. Volkswagen of America v. Young*, 272 Md. 201, 321 A. 2d 737 (1974). However, there are those kinds of conditions which, whether caused by design or manufacture, can never be said to involve a reasonable risk. For example, the steering mechanism of a new automobile should not cause the car to swerve off the road, *Henningsen v. Bloomfield Motors, Inc., supra;* the drive shaft of a new automobile should not separate from the vehicle when it is driven in a normal manner, *Elmore v. American Motors Corporation*, 70 Cal. 2d 578, 75 Cal. Rptr. 652, 451 P. 2d 84, 33 A.L.R.3d 406 (1969); the brakes of a new automobile should not suddenly fail, *Sharp v. Chrysler Corporation*, 432 S.W.2d 131 (Tex.Civ.App. 1968); and the accelerator of a new automobile

---

4. Professor Wade has suggested seven factors which should be considered in determining whether a product is "reasonably safe." These are:

"(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive."

Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L. J. 5, 17 (1965).

should not stick without warning, causing the vehicle suddenly to accelerate. Conditions like these, even if resulting from the design of the products, are defective and unreasonably dangerous without the necessity of weighing and balancing the various factors involved.

Under § 402 A, various defenses are still available to the seller in an action based on strict liability in tort. These defenses are set forth and explained in the official comments following § 402 A. For example, the seller is not liable where injury results from abnormal handling or use of the product (Comment h), where mishandling or alteration after delivery of the product renders it unsafe (Comment g), or if warnings or instructions supplied with the product are disregarded by the consumer where, if used in accordance with these warnings, the product would be safe (Comment j). Additionally, where the plaintiff unreasonably proceeds to use a product despite a known risk or danger, the defense of assumption of the risk is still available (Comment n). As to defenses in strict liability actions generally, *see* Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk*, 25 Vand. L. Rev. 93 (1972).

This Court has in prior cases, where the question was raised, declined to adopt the strict liability principles of § 402 A, finding that under the facts of those cases § 402 A was not applicable and would have afforded no additional basis of liability. It was therefore deemed inappropriate to adopt the theory of strict liability. A review of those cases, however, demonstrates that this Court has never rejected the strict liability theory of § 402 A as a basis of liability in an appropriate fact situation.

The first case in which this Court was urged to adopt the strict liability theory was *Telak v. Maszczenski*, 248 Md. 476, 237 A. 2d 434 (1968). There the plaintiff, a guest at a private swimming pool, was paralyzed when he dove into the pool from a diving board, installed by the owner, and struck his head on the bottom of the pool. In an action against the distributor of the pool, it was alleged that the pool was defective and unreasonably dangerous in that the maximum

depth of the pool, seven feet, was insufficient for safe diving. The evidence revealed that the owner had inspected several pools sold by the distributor before purchasing his pool and that the condition of the pool as delivered was exactly as represented by the seller and as observed by the buyer before the purchase. Relying on Comment g of § 402 A, that the section is applicable only where the product is "in a condition not contemplated by the ultimate consumer," the Court found that the strict liability theory was not applicable. 248 Md. at 488-489. It should also be noted that the plaintiff was an excellent swimmer, and was familiar with the depth and slope at the pool's bottom. *Id.* at 481, 484. Additionally, the diving board was not provided by either the manufacturer or the distributor of the pool, but was procured from another source and installed by the owners. *Id.* at 480. As previously discussed, § 402 A does not apply where subsequent mishandling or alteration render an otherwise safe product unsafe (Comment g), or where one proceeds in the face of a known danger (Comment n).

This Court was again urged to adopt strict liability in *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A. 2d 855 (1969). In that case the plaintiff was injured while cutting grass with a power mower when he slipped on an incline and caught his foot under the mower. An action was brought against both the manufacturer and retailer of the mower, on the basis of negligence, breach of warranty, and strict liability for failing to provide protective guards on the mower. This Court upheld the action of the trial court in sustaining a demurrer to all three counts. As to the strict liability count, the Court noted that the absence of a safety guard was apparent to the plaintiff at the time of the purchase, that the mower had presumably functioned safely for more than a year, and that by the plaintiff's own allegations, the injury was caused by his fall and not an unknown defect in the mower. Relying on Comment g, the Court found that § 402 A was not applicable. 253 Md. at 297.

Another alleged design defect was involved in *Volkswagen of America v. Young, supra*, 272 Md. 201. In that case, the driver of an automobile was killed when, upon impact with

another automobile, the seat in which he was sitting separated from the floor, propelling him into the rear portion of the car. The plaintiff alleged defective design in the seat mechanism and passenger compartment configuration, creating an unreasonable risk of injury. We again declined to adopt strict liability as a theory of liability, reasoning that under the particular facts of that case, strict liability would have "no special meaning." As previously discussed, in some circumstances the question of whether a particular design is defective may depend upon a balancing of the utility of the design and other factors against the magnitude of that risk. Thus, the existence of a design defect in a case like *Volkswagen* is a question which itself depends upon the degree of care exercised by the manufacturer in view of the type, style, purpose, and cost of the vehicle. 272 Md. at 221. Similarly in *Frericks v. General Motors Corp.*, 274 Md. 288, 336 A. 2d 118 (1975), a case also involving an alleged design defect where the existence of the defect itself depended in part upon the reasonableness of the seller's conduct, we reiterated that "[t]his Court has not, as yet, either rejected or accepted the 'strict liability' theory . . . in the type of case where that section might logically be applied." 274 Md. at 298. The alleged defect in the instant case, however, whether resulting from a defective design or not, is clearly of a different character from the asserted design defects in *Volkswagen* and *Frericks*.

General Motors argues that we should not adopt the doctrine of strict liability for several reasons. It contends that the warranty provisions of the Maryland Uniform Commercial Code and the doctrine of strict liability in tort are substantially the same in protecting the interests of both consumers and sellers, and thus, in its view, there is no need to adopt the theory of strict liability. General Motors further contends that, even if we were to conclude that the differences between the two theories of liability were significant enough to adopt § 402 A of the Restatement, the Legislature in enacting the warranty provisions of the Uniform Commercial Code has "preempted the field of products liability law." Finally, General Motors claims that

the adoption of strict liability would substantially alter the rights of consumers and sellers as presently defined by the law of negligence and contract, and that the policy reasons advanced by the courts for altering those traditional rights are more properly a matter of legislative rather than judicial determination.

We do not agree with any of General Motors' contentions. With respect to the differences between strict liability in tort and warranty actions, it is true that the requirement of privity, once an obstacle to recovery under a contract action, and a major reason for the adoption of § 402 A of the Restatement (Second), has been eliminated by the General Assembly of Maryland in actions where personal injuries result from a breach of warranty. Sections 2-318 and 2-314 of the Maryland Uniform Commercial Code. *See Frericks v. General Motors Corp.*, 278 Md. 304, 363 A. 2d 460 (1976). But there still remain various other requirements and limitations imposed by contract law which may be encountered when pursuing an action for breach of warranty but not when seeking damages for injury caused by a defective product under the theory of strict liability in tort.

One of the more significant differences between the two theories is the right of the seller to disclaim or limit remedies for breach of warranty. Although the Maryland Legislature has eliminated the right of sellers to disclaim or limit warranties arising from the sale of *consumer* goods, §§ 2-316.1, 2-719 (3) of the Maryland Uniform Commercial Code, there is no similar limitation on the right to exclude warranties where the goods involved are not consumer goods as defined in § 9-109. Under § 402 A of the Restatement, a limitation or exclusion of warranties is irrelevant to the question of the seller's liability for injury caused by defective goods regardless of the classification of the goods (Comment m). The notice requirement of § 2-607 of the Uniform Commercial Code may also prove to be an obstacle to recovery. Although we have recently held that a third party beneficiary of a seller's warranties is not required to give notice of breach as a precondition to maintaining a

breach of warranty action, *Frericks v. General Motors,* *supra,* 278 Md. at 315-316, an actual buyer is still required by § 2-607 (3) to give notice or be barred from any recovery for breach of warranty. There is no similar notice requirement for bringing an action based on strict liability in tort. Also, an action for breach of warranty is governed by the limitations period contained in § 2-725 of the Uniform Commercial Code, which provides that an action must be brought within four years of the time it accrues. A cause of action in a warranty case accrues "when tender of delivery is made." An action under the theory of strict liability in tort, however, would be governed by the general tort limitations period, Maryland Code (1974), § 5-101 of the Courts and Judicial Proceedings Article, which is three years but may begin to run at a later time. These are examples of significant differences between actions based upon contract and strict liability in tort.

Additionally, we cannot agree with General Motors that the Legislature has preempted the field of product liability law, precluding our adoption of Restatement § 402 A. The only authority cited by General Motors in support of this contention is the concurring opinion in *Markle v. Mulholland's, Inc., supra,* 509 P. 2d at 536-539. As the majority in that case noted in rejecting a similar contention and adopting strict liability, there is no indication that the Legislature, in enacting the Uniform Commercial Code, intended to prevent the further development of product liability law by the courts. In the absence of any expression of intent by the Legislature to limit the remedies available to those injured by defective goods exclusively to those provided by the Maryland Uniform Commercial Code, we believe that General Motors' preemption contention is without merit.

Finally, we disagree with General Motors' argument that adoption of strict liability would result in such a radical change of the rights of sellers and consumers that the matter should be left to the Legislature. As we have previously discussed, the major distinction between an action in strict liability in tort and one founded on

traditional negligence theory relates to the proof which must be presented by the plaintiff. Although the plaintiff need not prove any specific act of negligence on the part of the seller, as in other product liability cases, proof of a defect existing in the product at the time it leaves the seller's control must still be presented. As one commentator has observed, the doctrine of strict liability is really but another form of negligence per se, in that it is a judicial determination that placing a defective product on the market which is unreasonably dangerous to a user or consumer is itself a negligent act sufficient to impose liability on the seller (Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L. J. 5, 14 (1965)):

> "In essence, strict liability in this sense is not different from negligence per se. Selling a dangerously unsafe product is the equivalent of negligence regardless of the defendant's conduct in letting it become unsafe. This is exactly the situation when a pure-food statute is construed to make its violation negligence per se; if the food is not wholesome, the statute is violated and the defendant is negligent. It has long been recognized that although the normal test for negligence is the general standard of what a reasonable man would do under similar circumstances and, although this test is ordinarily applied by the jury, the courts on appropriate occasions may lay down specific rules of conduct. They do this when they accept a criminal statute as setting forth a specific rule and then adopt that rule for a civil case. But they also do it from time to time even in the absence of a statute. Thus, a court which appears to be taking the radical step of changing from negligence to strict liability for products is really doing nothing more than adopting a rule that selling a dangerously unsafe chattel is negligence within itself."

Thus, the theory of strict liability is not a radical departure from traditional tort concepts. Despite the use of the term

"strict liability" the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product. *Dippel v. Sciano, supra,* 155 N.W.2d at 63; Wade, *supra,* 19 Sw. L. J. at 13. Proof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller sufficient to justify imposing liability for injuries caused by the product. Where the seller supplies a defective and unreasonably dangerous product, the seller or someone employed by him has been at fault in designing or constructing the product.

Almost all of the courts of our sister states have adopted the strict liability principles set forth in § 402 A of the Restatement (Second) of Torts. Several reasons for adopting strict liability are summarized in Comment c to § 402 A as follows:

> ". . . the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

We find the above reasons persuasive. In our view, there is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller of that product is in a better

position to take precautions and protect against the defect. Yet this may be the result where injured parties are forced to comply with the proof requirements of negligence actions or are confronted with the procedural requirements and limitations of warranty actions. Therefore, we adopt the theory of strict liability as expressed in § 402 A of the Restatement (Second) of Torts.

For these reasons, we conclude that the third and sixth counts of the complaint state a cause of action under Maryland law. The first certified question is answered "Yes."

(2)

The second certified question concerns the issue of whether a third party beneficiary of a seller's warranty under § 2-318 of the Maryland Uniform Commercial Code may maintain an action for loss of consortium caused by breach of warranties.

Where there is an injury to a married person, recovery for damages to the marriage relationship in a breach of warranty action would clearly seem to be allowable as consequential damages under the principles of *Hadley v. Baxendale,* 9 Exch. 341 (1854). *See* §§ 2-714 and 2-715 of the Maryland Uniform Commercial Code; *Addressograph-Multigraph v. Zink,* 273 Md. 277, 286, 329 A. 2d 28 (1974). General Motors does not dispute this and, in fact, would appear to concede that if Evalyn Phipps had been the actual buyer of the automobile she could recover for loss of consortium. Rather, General Motors' objection to the fifth count is premised upon the narrower grounds of the nature of an action for loss of consortium as delineated in *Deems v. Western Maryland Ry., supra,* 247 Md. 95. Relying on *Deems,* General Motors argues that this count does not state a cause of action because an action for loss of consortium is for injury to the marriage entity and not an action for personal injury. Thus, General Motors concludes, it is not within the contemplation of § 2-318 of the Maryland Uniform Commercial Code which extends a seller's warranty "to any natural person ... who is injured

in person by breach of the warranty." In our view General Motors, in arguing that an action for loss of consortium is not for injury to a person, misconceives the holding in *Deems v. Western Maryland Ry., supra.*

In Maryland prior to *Deems*, a husband could bring an action for loss of consortium but a wife could not. In *Deems*, a wife attempted to bring a separate action for loss of consortium subsequent to the settlement of her husband's personal injury suit. The trial court sustained a demurrer to the action. In this Court, the wife argued that the Maryland law, in allowing a husband to maintain a separate action for loss of consortium but not a wife, was a denial of equal protection of the laws in violation of the Fourteenth Amendment. Because of this contention, and also because of the possibility of double recovery when a loss of consortium action is brought separately from the underlying personal injury action, this Court held that either the husband or the wife could assert a claim for loss of consortium but that the claim must be brought in a joint action for injury to the marital relationship tried at the same time as the underlying personal injury action.

The reasoning of the Court in *Deems* clearly indicates that an action for loss of consortium is an action for injury to both spouses and not, as General Motors contends, an action for damages to a legal entity separate and apart from the persons who comprise that "entity." In *Deems*, the Court was presented with the contention that the prior law allowing only one spouse to bring an action for loss of consortium was unconstitutional and that to rectify this situation no action for loss of consortium should be allowed by either spouse. The Court recognized, however, that loss of consortium represented a serious personal injury to both spouses and should continue to be compensable, stating (247 Md. at 108-109):

> "That both spouses suffer when the marriage relationship is adversely affected by physical injury to either is a fact evidenced, if not by logic, by human experience since the institution of marriage became a basic part of our mores. If the husband is

the one injured, it is not only the wife who is affected by reason of any resultant change of the husband's personality or ability to engage in all the intangible associations which marriage brings; he too suffers the effect of the change, if only in reaction to his wife's unhappiness. Today, at least, it is unquestioned that the desire to have children and the pleasures of sexual intercourse are mutually shared. If the husband's potency is lost or impaired, it is both the man and woman who are affected. If the physical injury is to the wife, she sustains the same kind of loss in the marital relation as he does in the converse situation.

"It is because these marital interests are in reality so interdependent, because injury to these interests is so essentially incapable of separate evaluation as to the husband and wife, that the conception of the joint action seems to us a fair and practical juridical development. It takes into account, we believe, the weighty criticism of the old law which restricts the right of recovery to the husband as well as the substantial arguments against creating a new and separate cause of action for the wife."

Thus, even though a loss of consortium action was referred to by the Court as an action "for injury to the marital relationship," it is clear that the underlying purpose and rationale of the joint action is to compensate the individual persons who form that relationship for the personal injury which they both sustain.

In essence, General Motors' contention is that a joint action for loss of consortium represents a separate cause of action accruing to the marriage entity and is therefore not an aspect of personal injury suffered by the persons who together form the marriage entity. That this is not the theory of *Deems* was made clear in *Travelers Indem. Co. v. Cornelsen*, 272 Md. 48, 50, 321 A. 2d 149 (1974), where the Court, discussing *Deems*, said:

"It is entirely clear to us that the decision in that

> case created a new substantive right, and as a concomitant, delineated a different procedural approach in actions for loss of consortium. Nevertheless, it gave rise to no new cause of action ...."

It follows then, that a joint action for loss of consortium may be maintained when a breach of warranty is alleged under § 2-318 of the Commercial Code. Both spouses are obviously natural persons within the meaning of § 2-318. And whatever limitation on the measure of damages may have been intended when the Legislature required that a third party beneficiary be "injured in person," we do not believe that it was intended to prevent recovery for such uniquely personal injuries as loss of consortium which traditionally were recoverable in a personal injury action. The second certified question is answered "Yes."

*Questions of law answered as herein set forth.*
*Appellee to pay costs.*