Michael A. NEMIR, M.D., Plaintiff,

v.

MITSUBISHI MOTORS CORPORATION, a Delaware corporation, and Chrysler Corporation, a Delaware corporation, Defendants.

No. 96–75380.

United States District Court,
E.D. Michigan,
Southern Division.

May 22, 2002.

George A. Hilborn, Craig E. Hilborn, Hilborn & Hilborn, PC, Birmingham, MI, Robert M.N. Palmer, Springfield, MO, for Plaintiff.

David R. Kelly, Bowman and Brooke LLP, Minneapolis, MN, Fred J. Fresard, Andrew Pride, Bowman and Brooke LLP, Detroit, MI, for Defendants.

## MEMORANDUM OPINION AND ORDER

FEIKENS, District Judge.

### I. Introduction

In this product liability suit concerning an allegedly defectively designed seat belt buckle, plaintiff contends that defendants should be held strictly liable under Maryland law. Defendants contend not only that strict liability does not apply, for they believe the seat belt buckle at issue was not inherently unreasonably dangerous so as to warrant such liability, but also that there was no design defect in the buckle.[1]

■ Under Maryland law, it is my role to determine whether a theory of strict liability, or a theory of risk-utility under the Wade factors,[2] will be presented to the jury. *Lundgren v. Ferno-Washington Co.*, 80 Md.App. 522, 528, 565 A.2d 335 (1989).

### II. Factual Background

My previous opinion in this case provides the factual background. *Nemir v. Mitsubishi Motors Sales Corp.*, 60 F.Supp.2d 660 (E.D.Mich.1999).

### III. Analysis

Plaintiff argues that the seat belt buckle in this case presents an "inherently unreasonable risk of danger," and should be

---

1. In its opinion, the United States Court of Appeals for the Sixth Circuit, in reversing in part my grant of summary judgment, ruled that these are fact issues for the jury. *See In re: Michael A. Nemir*, No. 01–2260 (6th Cir. filed Oct. 12, 2001) (per curiam).

2. The seven factors to consider in determining whether a product is reasonably safe are: "(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." *Phipps v. General Motors Corp.*, 278 Md. at 346 n. 4, 363 A.2d 955 (quoting Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 17 (1965)).

submitted to the jury under the guidance of Restatement (Second) of Torts, § 402A (1956), as adopted by the Maryland courts. *Phipps v. General Motors Corp.,* 278 Md. 337, 340–41, 363 A.2d 955 (1976). The Sixth Circuit rejected plaintiff's writ of mandamus on this issue, which sought to compel me to submit the issue of an "inherently unreasonable risk" of a product to the jury. *In re: Michael A. Nemir,* No. 01–2260 (6th Cir. filed Oct. 12, 2001) (per curiam).

Maryland courts have recognized that there are some "conditions which, whether caused by design or manufacture, can never be said to involve a reasonable risk." *Phipps,* 278 Md. at 345, 363 A.2d 955.

> For example, the steering mechanism of a new automobile should not cause the car to swerve off the road...; the drive shaft of a new automobile should not separate from the vehicle when it is driven in a normal manner...; the brakes of a new automobile should not suddenly fail...; and the accelerator of a new automobile should not stick without warning, causing the vehicle to suddenly accelerate. Conditions like these, even if resulting from the design of the products, are defective and unreasonably dangerous without the necessity of weighing and balancing the various factors involved.

*Id.* at 345–46, 363 A.2d 955 (citations omitted). In cases such as these, I must instruct the jury on a strict liability theory of recovery. But before I do so, I must make the "initial determination as to whether the product involves an 'inherently unreasonable risk'" of danger. *Lundgren,* 80 Md.App. at 528, 565 A.2d 335. "[W]e feel it is not the province of the jury to decide that a particular product...is inherently dangerous. Because of the pol-

icy considerations at stake and the need for consistent application, this determination is one that a jury in each individual case is ill equipped to make." *Id.* at 530, 565 A.2d 335.

To assist me in making my determination, with the help of the American Association for the Advancement of Science (AAAS), I appointed Eddie Cooper and Lindley Manning to serve as experts. I asked them to determine whether the Takata 52–series seat belt buckle presented an inherently unreasonable risk of danger to the plaintiff. *Order Appointing Court Experts* (Dec. 15, 2001). To aid them in making their determination, I supplied to them a letter (dated February 7, 2002), which cited and explained the touchstone opinions of *Phipps* and *Lundgren.* I also supplied them with copies of these cases.

In answering the question presented, both examined and tested the plaintiff's buckle and exemplar Takata 52–series seat belt buckles. (Cooper Dep. at 36 ("I looked at four exemplar buckles and the subject buckle."), Manning Dep. at 34 (discussing that he examined exemplar buckles and the subject buckle.)).

Cooper noted that his "concern was partial engagement of the buckle." (Cooper Dep. at 23.) To investigate this, Cooper examined the buckle to understand the mechanism, and then measured the travel of the latch plate inside the buckle with a micrometer to precisely determine the range in which partial latch may occur. (Cooper Dep. at 73.) He found this range to be extremely small.[3] (Cooper Dep. at Ex. 3.) He concluded that "both the test results and my experience in this process allow...me to form the opinion that this is not an unreasonable [risk of danger], that it is in fact very difficult to achieve the

---

**3.** The range for partial latch via the insertion method was from .004 to .014 of an inch, and

for the push-button method was between .022 and .045 of an inch.

partial engagement...." (Cooper Dep. at 82.)

In his deposition testimony, Manning mounted the buckle to a table, manually partially engaged the latch plate inside the buckle, and then stated that he pulled the latch plate out while measuring the force it took to remove the latch plate from the buckle with a force gauge. (Manning Dep. at 43–44.) Based on these tests, Manning believed "that the defect we found is unreasonably dangerous." (Manning Dep. at 53.)

When asked whether the defect posed an inherently unreasonable risk of danger, Manning stated, "[m]aybe if it's inherently I don't know. Now we're talking lawyers words. I don't-I'm not sure what that means in this context." (Manning Dep. at 50.) Manning continued, "[t]he fact that it would happen even once or a few times makes it unreasonably dangerous." (Manning Dep. at 53–54.)

Maryland law, however, distinguishes between those dangers which may be unreasonable and those which pose an inherently unreasonable risk of danger sufficient to trigger strict liability. Manning's opinion does not differentiate between these two levels of liability. Despite his opinion that the seat belt buckle at issue presents an inherently unreasonable risk of danger, Manning has failed to provide any testimony which would place the claim in this case beyond the range of Maryland's risk-utility analysis for alleged design defect conditions. Therefore, the opinions of the court-appointed experts weigh against a finding that the seat belt buckle at issue presented an inherently unreasonable risk of danger.

In addition, another factor I also consider is the length of time which Dr. Nemir used the seat belt buckle without incident. Dr. Nemir's claim, unlike any of the examples of "strict liability" conditions listed by the Maryland court in *Phipps*, involves a product that undisputedly was used safely for several years without incident. This factor weighs against an instruction of strict liability.

Further, I must also consider that the seat belt buckle design in this case was tested and certified to be compliant with Federal Motor Vehicle Safety Standard ("FMVSS") 209 by an independent testing agency, U.S. Testing. During testing, the seat belt buckles did not achieve a condition of partial latch.[4] This factor also weighs against an instruction of strict liability.

At trial, the only evidence presented on this issue was testimony given by plaintiff's expert Thomas Horton. Horton testified that all Takata 52–series buckles are defective.[5] (Tr. at Vol. IV, p. 97, lns. 21–23.)

Q. And with respect to the North American market and all manufacturers-and now I'm just talking about the TK 52 buckles but in all manufacturers, not limiting it just to Mitsubishi-do you know how many buckles would be out there in the North American market-TK 52 buckles?
A. No.

---

4. I note that is was not necessary for Dr. Nemir's seat belt buckle itself to be tested, since liability is predicated on a design, and not manufacturing, defect. *Federal Motor Vehicle Safety Standard 209, § 4.3(g), § 5.2(g).*

5. Horton also testified that every buckle he has *ever* reviewed is defective. (Tr. at Vol. IV., p. 96, ln. 8.) Examples examined and found to be defective by Horton include those manufactured by Takata (*id.* at p. 113–14), Allied Signal (*id.* at 99, ln. 24–25), Tokai Rika (*id.* at 100, ln. 22–23), Hyundai (*id.* at 100, ln. 24–25), Isuzu (*id.* at 101, lns. 1–2), TRW (*id.* at 103, 111, lns. 3–6) and Navistar (*id.* at 101, lns. 3–4).

Q. Would you quarrel with a figure of over thirty million?

A. No.

Q. And, Mr. Horton, your view is that every one of those is defective. Is that right?

A. If they carry the same design as we see here, yes.

Q. Okay. Sir, the TK 52, are there any out there that aren't defective, in your view?

A. If they're the same design as this, no.

(Tr. Vol. IV at p. 163–64.)

Even though the question of a defective design in the seat belt buckle in the Nemir automobile is central for the jury's consideration, Horton stated that all Takata 52 buckles have a design defect. He also testified that there was only one buckle design of which he had knowledge that mechanically could not go into partial latch and therefore was safe and not defectively designed.

Q. Now, let's talk about-do you have an opinion that there is a buckle out there-I mean, you may have an opinion there are many buckles out there, but do you have an opinion that there is a buckle out there that does not have this problem?

A. Yes, I do.

Q. And what particular buckle is that?

A. The TRW-designed RNS–3 buckle.

(Tr. at p. 80, lns. 2–9.)

When one considers the extravagant context of his conclusion, it adds to the uncertainty and unreliability of this conclusion.

## V. Conclusion

■ Based on this evidence, I conclude that the Takata 52–series buckle at issue in this suit does not present an inherently unreasonable risk of danger.

**IT IS SO ORDERED.**