UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

FREDERICK SHAFFER HIGGINBOTHAM,
III; STEPHANIE HIGGINBOTHAM,
    *Plaintiffs-Appellants,*

    v.

KCS INTERNATIONAL, INCORPORATED,
t/a Cruisers Yachts; WINDLINE,
INCORPORATED; WAREHOUSE CREEK
YACHT SALES, INCORPORATED,
    *Defendants-Appellees.*

No. 02-1527

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(CA-00-2764-MJG)

Argued: October 31, 2003

Decided: January 22, 2004

Before WILKINS, Chief Judge, and KING and
GREGORY, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Chief Judge Wilkins and Judge King joined.

---

### COUNSEL

**ARGUED:** Mark Thomas Mixter, LAW OFFICES OF MARK T.
MIXTER, Baltimore, Maryland, for Appellants. J. Christopher Bou-

cher, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland; Richard Lee Nilsson, BRIZENDINE & NILSSON, Timonium, Maryland, for Appellees. **ON BRIEF:** Daniel Karp, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland; Mary Malloy DiMaio, MAHER & ASSOCIATES, Towson, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

GREGORY, Circuit Judge:

### I.

This is an appeal from the United States District Court for the District of Maryland (Garbis, J.). Appellants, Frederick Shaffer Higginbotham, D.D.S., and his wife Stephanie (collectively, the "Higginbothams"), appeal the district court's grant of summary judgment for the appellees. The Higginbothams sued seeking compensation for injuries Dr. Higginbotham sustained while attempting to use a broken swim ladder while on board his marina-docked yacht. Dr. Higginbotham attempted to extend the swim ladder attached to his boat and noticed that it was stuck. He nevertheless forced the ladder to extend and, as a result, was thrown across the yacht and sustained significant injuries. The Higginbothams sued the manufacturer of the yacht, the manufacturer of the ladder, and the yacht broker, alleging negligence, breach of warranty, and defective design.

The district court granted partial summary judgment for the yacht manufacturer as to the negligence and breach of warranty claims, and granted full summary judgment for the yacht broker and ladder manufacturer as to the loss of consortium, negligence, breach of warranty and strict liability claims. After an evidentiary hearing, the district court excluded the testimony of the Higginbothams' sole expert

because his testimony was both unreliable and unscientific. The expert sought to establish that the ladder was defective because it bent under the pressure exerted by Dr. Higginbotham's normal use of the ladder. Alternatively, the expert alleged that the ladder suffered from inherent metallurgical defects. After excluding the proffered expert testimony, the district court concluded that the Higginbothams had failed to produce adequate evidence to establish that a defect in the ladder was a proximate cause of the bend. Thereafter, the district court granted summary judgment for the yacht manufacturer as to the remaining claims. The Higginbothams appealed. For the reasons discussed herein, we AFFIRM.

## II.

This case arises out of injuries Dr. Higginbotham sustained in May of 1991 while attempting to extend the swim platform ladder on a yacht. The yacht at issue is a demo-model purchased by the Higginbothams' private corporation, which collects charter fees for private charters. The ladder at issue is a three-rung white aluminum telescoping ladder used to board the vessel from the water. Prior to Dr. Higginbotham's purchase, the ladder had been used without incident in the showroom by dealers and potential customers who desired to board the yacht. On the day of the accident, Dr. Higginbotham attempted to extend the ladder but it was "stuck or [it] hesitated" before coming loose. J.A. at 1866. Dr. Higginbotham pulled hard on the ladder and when the ladder freed itself, Dr. Higginbotham was thrown backwards hitting his head, shoulder and back on the transom and his hip on the swim platform of the yacht. Also, Dr. Higginbotham's hand was lacerated by the metal ring attached to the ladder.

The Higginbothams brought suit in September 2002 against the manufacturer of the yacht, KCS International Inc. ("KCS"), the yacht broker, Warehouse Creek Yacht Sales, Inc. ("Warehouse Creek"), and the manufacturer of the ladder, Windline Inc. ("Windline"), alleging breach of express and implied warranties, negligence, strict liability and loss of consortium. In November 2001, Warehouse Creek and Windline filed separate motions for summary judgment. After a hearing in February 2002, the district court granted Warehouse Creek's motion for summary judgment and granted in part Windline's motion for summary judgment. The court reserved its ruling on the remainder

of Windline's motion pending a *Daubert* hearing to determine the admissibility and adequacy of the Higginbothams' proffered expert testimony. After the *Daubert* hearing, the district court declared the Higginbothams' expert testimony inadmissible under *Daubert*. Consequently, the court granted the balance of Windline's motion for summary judgment.

## III.

We must first determine whether the district court properly excluded the Higginbothams' only expert testimony. This court reviews the decision of a district court to admit or exclude evidence for abuse of discretion. *Westberry v. Gislaved Gummi AB, et. al.*, 178 F.3d 257, 261 (4th Cir. 1999)(citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997)).

The introduction of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides, in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702 (West 2002).

Expert testimony is admissible under Rule 702, then, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy. *Westberry*, 178 F.3d at 261 (citing *Daubert*, 509 U.S. at 590).

Ultimately, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks

omitted). The district court's role in considering the admissibility of expert testimony is that of a "gate-keeper," whose prime task is to assess the reliability and relevancy of the proffered evidence. *See id.* at 1174. As the gate-keeper, the district court's inquiry is "a flexible one" focusing on the "principles and methodology" employed by the expert, not on the conclusions reached. *Daubert*, 509 U.S. at 594-95. When making its initial determination of reliability, the trial judge enjoys broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will, however, depend upon the unique circumstances of the expert testimony involved. *Kumho Tire Co.*, 526 U.S. 149-50.

As the gate-keeper, the district court must remember that due to the difficulty of evaluating their testimony, expert witnesses have the potential to "be both powerful and quite misleading." *Daubert*, 509 at 595 (internal quotation marks omitted). Thus, where the expert proffer has a greater potential to mislead than to enlighten, that evidence may properly be excluded. *Westberry*, 178 F.3d at 261 (citing *United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995)).

Under the above standard, we conclude that the district court properly excluded the testimony of the Higginbothams' expert, Mr. Kenneth Court.[1] The court concluded that Mr. Court's testimony was not based upon reliable methodology and, therefore, his conclusions were inadmissible. The district court found that the Higginbothams had presented "evidence adequate to support a finding that:

    A.    Sometime prior to May, 30 1999, when Dr. Higginbotham used the latter at issue, the ladder was bent by some force.

    B.    The bend in the ladder was a proximate cause of the accident and, thus, of the injuries to Dr. Higginbotham.

---

[1]Mr. Court is a naval architect marine engineer. J.A. at 1109. The district court qualified him as a mechanical engineer with knowledge of ladders in a marine context. J.A. at 1870. He is not a metallurgist, J.A. at 1116, and has no special training in the design of swim ladders. J.A. at 1242-43.

J.A. at 1869. The court also considered Plaintiffs' alternative arguments that the ladder was bent by "normal ladder use" or due to "defective design." The district court, thereafter, entered summary judgment against the Higginbothams because there was no evidence that the alleged "defect in the ladder was a proximate case of the bend." J.A. at 1869-70. We discuss the gravamen of the Higginbothams' arguments *in seriatim* below.

## A.   Normal Ladder Use

The district court found inadmissible Mr. Court's expert opinion that the bend was caused by Dr. Higginbotham's normal use of the ladder. The court also found that "even if admitted, the said opinions would not amount to evidence adequate to establish the existence of a defect in the ladder or a causative relationship between any defect and the bend at issue." J.A. at 1870.

The district court properly rejected Mr. Court's analysis which is patently laden with flaws. Most notably:

> Mr. Court agrees with [defense expert] Dr. Richard that the static forces applied to the ladder from normal use by Dr. Higginbotham (assumed to be a 200 pound individual) would result in an applied force of *less than half* of that needed to cause this bend.

J.A. at 1871 (emphasis added). Mr. Court himself concedes that Dr. Higginbotham's normal use could not have caused the bend. Indeed, "by the *Daubert* hearing, Mr. Court had changed his opinions for a third time to the point where both experts agreed that there would only be 37.9% of the force necessary to bend the ladder visited upon it by a 200 pound man ... *It would take over 62% more than that to bend it*." Brief of Appellees at 21 (citing J.A. at 1804, 1807-08, 1811-12)(emphasis added). Mr. Court then, without any valid basis, "simply jumps to the conclusion that the dynamic component of the force must have been sufficient to cause the bend." J.A. at 1871.

Mr. Court reached his conclusion without performing any testing on the actual ladder at issue or even an exemplar ladder. J.A. at 1815-

17. And, his methodology was clearly speculative. During his deposition, Mr. Court attempted to explain his methodology, but conceded that it rested upon "assumptions," not science.

> Q. Mr. Court, you don't know the number of pounds that were visited by Dr. Higginbotham at any point on this ladder other than the fact that they are in excess of some point; is that right?
>
> * * *
>
> A. To do an exact model of a man loading a ladder, you would have to know what he did exactly at that time, and that modeling is objected to unless your model is the exact same as what really happened. Any time you start putting in **assumptions**, you open things. So what I did was I pointed out my model of a **hypothetical man**, how the load would occur? I did a calculation of the ladder and what would cause it to bend, and then I compared the two and said, there is enough slack for the dynamics to pick up the difference, and there is where I am.

J.A. at 1352-53. Similarly, Mr. Court can only speculate as to when the ladder was bent. J.A. at 1182. He has done no calculations or drawings as to the loads that would be visited upon the ladder if the ladder were used to board the boat out of the water. J.A. at 1201-03. He did not calculate the yield strength the ladder would require in order for it not to bend. J.A. at 1240-41. And, he did not take buoyancy into account, J.A. at 1783, 1790-91, even though he admits that buoyancy accounts for "some percentage" of the force visited upon the ladder. *Id.* Yet, a swim ladder is most often used in water where buoyancy is surely a factor.

In any event, Mr. Court's calculations concerning the force he assumes Dr. Higginbotham would have applied to the ladder are insufficient in that Mr. Court completely failed to notice that Dr. Higginbotham's ladder had handholds. J.A. at 1828-31. Thus, when he calculated the force visited upon the ladder by Dr. Higginbotham—or actually, a 200 pound hypothetical man—he did not even consider the

fact that the absence of a handhold would require "Dr. Higginbotham [to lean] much farther back than he would need to, and [to put] much more force on the ladder," and that the absence of a handhold "puts more on the dynamic force," which admittedly "cut[s] the number down again." J.A. at 1830-31.

Each of these flaws alone casts sufficient doubt upon the reliability of Mr. Court's methodology. This is particularly true since "the proponent of the expert proffer bears the burden of establishing admissibility by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10. Considered in the aggregate, these flaws raise a high inference of unreliability.

The flaws in the proffered expert testimony, however, cut much deeper. Based upon Mr. Court's testimony, there is no sufficient basis upon which a reasonable juror could conclude that Dr. Higginbotham's normal use of the ladder caused the ladder to bend. There are too many alternate theories of causation for Mr. Court's theory to establish causation by a preponderance of the evidence. Most notably, the swim ladder on the Higginbothams' previous yacht was destroyed while being docked by someone else because the yacht was not properly tied down and, as a result, it coasted back into the floating docks. J.A. at 184-85. Indeed, the yacht at issue was docked in Maryland and used by others as a charter vessel while the Higginbothams were home in West Virginia during the off-season. Thus, the district court properly noted that:

> it is undisputed that the ladder could have been bent as a result of force from contact between the extended ladder and an object such as a pier, another boat, etc. Such contact could occur without the knowledge of Dr. Higginbotham. Of course, it is not the Defendant's burden to prove that this (or some other) "innocent" force caused the bend. Rather, it is the burden of Plaintiffs to present evidence from which a jury could find that, more likely than not, the bend was caused by Dr. Higginbotham's normal ladder use.

J.A. at 1871-72.

Given the court's tenable objections to Mr. Court's evidence, and his reliance upon "'logical' reasoning that because there was a bend

in the metal, whatever dynamic force was necessary must have been contributed by Dr. Higginbotham's ordinary ladder use," J.A. at 1871, the district court's exclusion of Mr. Court's expert testimony was not an abuse of discretion. Mr. Court's unreliable conclusions, clearly have the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 596.

## B. Defective Design

The district court correctly concluded that "[e]ven if Plaintiffs were able to prove that the bend in the ladder was caused by Dr. Higginbotham's normal use, they would not be able to prove an actionable defect in the ladder." J.A. at 1872. That is because "[t]here is no evidence establishing any applicable design standards" and because Mr. Court's expert opinion that "the ladder was defective in design is manifestly inadmissible." *Id.*

Under Maryland law, the primary issue in a design defect case "is whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981) (citing *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976)(adopting strict liability in tort)). In design defect cases, *Phipps* directs courts to balance:

    (1)   the usefulness and desirability of the product;

    (2)   the availability of other and safer products to meet the same need;

    (3)   the likelihood of injury and its probable seriousness;

    (4)   the obviousness of the danger;

    (5)   common knowledge and normal public expectation of the danger (particularly for established products);

    (6)   the avoidability of injury by care in use of the product; and

> (7) the ability to eliminate danger without seriously impairing the usefulness of the product.

*Singleton*, *supra* (citing *Phipps*, 278 Md. at 345 n.4, 363 A.2d at 959 n.4).

The fact that another design alternative exists—even a safer one—standing alone is patently insufficient. The district court correctly concluded, therefore, that "[a]n admissible opinion as to a design defect requires more than an ability to hypothecate a design that would have avoided the accident at issue." J.A. at 1873 (citing *Tokio Marine & Fire Ins. Co., Ltd. v. Grove Manuf'g Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992)("[An] opinion on whether or not there is a design defect call[s] in essence, for meaningful cost-benefit analysis. This required, in turn, considerable familiarity with the device [at issue] with [device] design, manufacture and marketing; with applicable industry standards, and so on.").

As stated above, Mr. Court has no training in metallurgy nor does he have any training in ladder design. Outside of this case, Mr. Court has no familiarity with the ladder at issue or swim ladders in general. In fact, he has never manufactured a swim ladder or taken part in manufacturing one. J.A. at 1242-43. Yet, his "proffered design defect opinion is based upon his conclusion that a stronger ladder could have been built using steel rather than aluminum." J.A. at 1873. Mr. Court, however, failed to establish that aluminum—as opposed to steel—is an inadequate material. And, he offers no admissible expert opinion as to the other factors required under Maryland law. Nor is he qualified to do so.

Moreover, the district court properly rejected Mr. Court's alternative and unsupported conclusion that if there was no design defect, there must have been a defect in the metal used to make the ladder. As discussed above, Mr. Court is not a metallurgist and has no special training as a materials engineer. Consequently, his opinion is invalid and the court below correctly concluded that "there is not the slightest reason to suspect a metallurgical defect in view of the extensive use of the ladder without incident prior to Dr. Higginbotham's acquisition of the boat."[2]

---

[2]As discussed above in the facts, Dr. Higginbotham's boat was used as a demo model before he purchased it. Sales staff and customers fre-

Accordingly, the district court did not abuse its discretion by excluding Mr. Court's expert testimony on defective design. Because the entirety of Mr. Court's expert testimony was properly excluded, summary judgment on all claims was clearly proper. We need not reach the remaining negligence and strict liability claims separately because the elements of proof are the same whether the claim be for strict liability or negligence.[3] The Higginbothams failed to establish both a design defect and causation and, therefore, all of their negligence, breach of warranty and strict liability claims fail.

### IV.

In sum, the district court's exclusion of Mr. Court's expert testimony was not an abuse of discretion. Consequently, the Higginbothams failed to present any competent evidence of a design defect, failed to establish causation, and failed to establish negligence on the part of any defendant. "If no material factual disputes remain, summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial." *A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 190 (4th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Accordingly, the district court's grant of summary judgment on all claims as to all defendants was not erroneous.

*AFFIRMED*

---

quently used the ladder without event while it was in dry dock.

[3]*Hood v. Ryobi N. America, Inc.*, 17 F. Supp. 2d 448, 450 (D. Md. 1998), *aff'd*,181 F.3d 608 n.1 (4th Cir. 1999)("The elements of proof are the same whether the claim be characterized as one for strict liability or negligence ... or breach of warranty.")(citing *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 117 (4th Cir. 1981); *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n.3 (D. Md. 1993); *Tauber v. Nissan Motor Corp., USA*, 671 F. Supp. 1070, 1073 (D. Md. 1987); *Jensen v. American Motors*, 50 Md. App. 226, 437 A.2d 242, 247 (Md. Ct. Sp. App. 1981); *Frericks v. General Motors Corp.*, 274 Md. 288, 336 A.2d 118 (1975)).