**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 16-1183**

———————————

JOHN T. CADY,

               Plaintiff – Appellant,

     v.

RIDE-AWAY HANDICAP EQUIPMENT CORPORATION; ELECTRONIC MOBILITY CONTROLS, LLC,

               Defendants – Appellees,

     v.

JOHN H. CADY,

               Third Party Defendant.

———————————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:12-cv-02667-RWT)

———————————

Argued: March 22, 2017                    Decided: July 17, 2017

———————————

Before KING and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

———————————

Affirmed by unpublished opinion. Senior Judge Davis wrote the opinion, in which Judge King joined. Judge Diaz wrote an opinion concurring in the judgment.

———————————

Matthew Jacob Chalker, Annapolis, Maryland, for Appellant. Saamia H. Dasti, WARANCH & BROWN, LLC, Lutherville, Maryland; Brian Thomas Stapleton, GOLDBERG SEGALLA, LLP, White Plains, New York, for Appellees.

———————————

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

This appeal arises from an accident involving Plaintiff-Appellant John T. Cady's vehicle, a 2007 Buick Terraza van that, for the use of his quadriplegic son, had been fitted with an AEVIT ("Advanced Electronic Vehicle Interface Technology") driving system. Cady, the driver and sole occupant of the van at the time of the accident, suffered severe injuries. He filed the instant lawsuit against Electronic Mobility Controls, LLC ("EMC"), the designer and manufacturer of the AEVIT system, as well as Ride-Away Handicap Equipment Corporation ("Ride-Away"), the entity responsible for installing the system in his van (together, "Defendants").

The district court excluded the testimony of Cady's engineering expert and ultimately entered judgment in favor of Defendants. On appeal, Cady argues the court erred when it precluded his expert and barred various claims based on defenses of contributory negligence, assumption of risk, product misuse, and failure to heed warnings. For the reasons that follow, we affirm.

I.

A.

We begin by describing the relevant components of the AEVIT drive-by-wire system. In AEVIT-enhanced vehicles, the driver will often manipulate steering and gas/brake inputs through orthotic devices, such as joysticks. The AEVIT system converts the driver's movements into digital signals that are sent to corresponding modules and mounted electromechanical servomotors ("servos"), which then trigger the vehicle's existing driving mechanisms.

3

Put simply, when the driver uses the gas/brake input to call for acceleration, the gas/brake servo responds and moves the gas pedal. When the driver uses the steering input to turn the van, the steering servo rotates the steering column. When the driver uses the gas/brake input to call for brake, the gas/brake servo depresses the brake.

J.A. 874.

An L-shaped brake extension pad is attached to the brake pedal. The gas/brake servo is attached to a drive arm mounted to a spool, and a white plastic roller on the drive arm acts as the contact point between the servo and the brake pedal's extension. As the gas/brake servo rotates in the brake direction, the drive arm rolls counter-clockwise against the brake pedal and depresses it downward, thereby applying the brakes. The servo is positioned such that the roller arm is centered over the "tall" segment of the L-shaped extension pad.

Non-disabled drivers, such as Plaintiff Cady, can operate an AEVIT-enhanced vehicle with conventional acceleration, braking, and steering by converting the vehicle into its original equipment manufacturer ("OEM") mode. To do so, the driver must properly disengage and reengage certain pins in the Engage Lever.[1] If a driver attempts

---

[1] The manual explains the process as follows:

Step 4:    The engage lever has two pins. The larger is the Safety Detent Pin and can be completely removed. The smaller pin is the Indicator Pin which is spring-loaded and captive. Reach down and pull the Safety Detent Pin out of the Engage Lever.

Step 5:    Apply a very small amount of pressure to the engage knob and [p]ull out the Indicator Pin about a [one-fourth inch]. The knob is spring loaded, so you should . . . feel some resistance. Continue to push in the engage knob until you feel the Indicator [P]in lock in place.

(Continued)

4

to use the steering wheel in the conventional manner while the vehicle is operating in AEVIT mode, the steering wheel may be difficult to move. In contrast, the vehicle's original brake and gas pedals function in the usual manner even when the AEVIT mode is engaged.

The AEVIT system is equipped with a data logger that digitally records the input devices' movements, the servomotors' movements, and the signal transmissions received or sent by the drive modules. The system is also distributed with an owner's manual, which contains various warnings regarding the vehicle's operation. The warnings include instructions that "AEVIT is intended for use only by persons professionally trained in [its] function and operation," that persons without proper training should not operate the vehicle or the AEVIT system, and that persons should not operate the vehicle "if th[e] Safety Detent Pin is not installed." J.A. 1147, 1150, 1152, 1153. Additional warnings are printed on AEVIT component parts, including an instruction printed directly on the gas/brake input to "not operate [this equipment] without proper training." J.A. 935. Several warning stickers were also placed throughout the interior of Cady's van; one such sticker, placed beneath the steering wheel, stated: "DO NOT OPERATE THIS VEHICLE WITHOUT THE SAFETY PIN INSTALLED." J.A. 1166.

---

Step 6:      Replace the Safety Detent [P]in in the Engage Lever. Do NOT operate the vehicle without the Safety Detent Pin installed.

J.A. 144.

5

## B.

Fred Hermann, a Ride-Away employee and an EMC-certified technician, installed the AEVIT system in Cady's 2007 Terraza van. After inspecting, reviewing, and test-driving the modified van, Ride-Away sold it to Cady in August 2008. Cady's quadriplegic son, John H. Cady ("Junior"), completed the necessary training to operate the AEVIT system. Cady neither began nor completed any such training.

On January 7, 2010, Junior drove the van following unrelated repairs to the vehicle's doors and heating system. Upon running a few errands with the van, Junior began to experience difficulties when accelerating. Junior parked the vehicle in the lot of his family's business and called Hermann to report the issue. Hermann suspected that the accelerator cable had broken, and he offered to pick up Junior and the van. Junior declined, and he then called his family for help.

Upon receiving Junior's call, Cady, his wife, his son-in-law Jason Burghardt, and Junior's assistant drove together to the parking lot. Cady and Burghardt investigated the van for approximately 20 minutes; they believed that the brake and steering input were functional but that the gas input was no longer responsive. Cady then attempted to switch the van from AEVIT mode to OEM mode by engaging the Safety Detent Pin. However, after a few attempts, Cady was unable to properly engage the pin. Cady then decided to drive the car in "mixed mode" by using the AEVIT hand controls for steering and braking while using his foot on the gas pedal to accelerate in a conventional manner. Cady did not review the Owner's Manual or any other documentation accompanying the AEVIT system before operating the van. He had never before driven a vehicle in "mixed

6

mode" and had no training to operate the AEVIT system, but he test drove the van in the parking lot before attempting to drive the van to his home.

Cady asserted he was driving down a hill when the van suddenly lost electrical power with the engine still running. Cady was able to turn the steering wheel in only one direction and with great difficulty. The van allegedly drove left, across two lanes of oncoming traffic, before going off the road. Cady stated that although he had stepped on the brake with his foot, the van failed to stop and collided into a tree. Cady suffered numerous injuries as a result of the crash, including a shattered hip and pelvis. He was required to undergo multiple surgeries and has incurred approximately $1 million in medical expenses.

Following the crash, data was downloaded from the AEVIT and OEM data recorders. The AEVIT data logger captures data in blocks, and AEVIT data block 5 — created as the crash occurred — depicted approximately 74 seconds of data immediately preceding Cady's impact. Between seconds 62 to 67 of this data block, the van's speed fluctuated between 33 and 35 miles per hour ("mph"). After second 70, even though the brakes were called for, the speed increased from 34 to 37 mph before slowing to 33 mph. Impact occurred at second 74, when the van's speed dropped to 0 mph.

## C.

Cady alleged claims of strict products liability (Claim I), negligent design, manufacture, and installation (Claim II), negligent failure to warn (Claim III), breach of express warranty (Claim IV), breach of implied warranty of merchantability (Claim V), breach of implied warranty of fitness for particular use (Claim VI), breach of contract

7

(Claim VII), fraud (Claim VIII), fraudulent concealment (Claim IX), and negligent misrepresentation (Claim X). Following the conclusion of discovery, the parties filed several motions before the district court. Defendants filed motions for summary judgment as well as motions to exclude Cady's engineering expert, Mark Ezra; Cady similarly moved for partial summary judgment and to preclude Defendants' experts. The district court denied Cady's motions and granted Defendants' motions. With respect to Cady's individual claims, the court determined that, as a matter of law, the affirmative defenses of contributory negligence and assumption of the risk defeated his negligence claims (Claims II, III, and X), strict product liability claim (Claim I), and breach of warranty claims (Claims IV, V, and VI). The court further determined that Cady's product misuse and failure to heed warnings also warranted summary judgment as to his negligence and warranty claims.[2]

Cady timely appealed, contending that the district court erred and abused its discretion in its preclusion of his expert and its summary judgment determinations regarding the affirmative defenses.

## II.

## A.

We observe, first, that the parties and the district court discussed the affirmative defenses raised in the summary judgment motions before addressing the admissibility of Cady's expert. However, this analytical framework places the cart before the horse.

---

[2] The court also dismissed Cady's claims for breach of contract, fraud, and punitive damages. The dismissal of these claims is not at issue in this appeal.

8

Ezra's expert testimony is the *only* evidence of causation that Cady proffers to support his various claims and oppose summary judgment, and a plaintiff must produce probative evidence of causation to successfully bring any of the claims currently at issue in this appeal.[3]  *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) ("[N]egligence is not actionable unless it is a proximate cause of the harm alleged." (citation omitted)); *Owens-Illinois, Inc. v. Armstrong*, 604 A.2d 47, 52 (Md. 1992) ("Causation is a necessary element of any strict liability action."); *Twombley v. Fuller Brush Co.*, 158 A.2d 110, 111 (Md. 1960) ("Proof of causation is, of course, necessary as a foundation for liability on either [breach of warranty or negligence].").[4]  As Plaintiff's counsel acknowledged at oral argument, if Ezra's testimony were properly deemed inadmissible, Cady would be unable to satisfy his burden of proof and the entry of summary judgment would necessarily be proper.  *See Pharmanetics, Inc. v. Aventis Pharm., Inc.*, 182 F. App'x 267, 274 (4th Cir. 2006); *Free v. Bondo-Mar-Hyde Corp.*, 25 F. App'x 170, 172–73 (4th Cir. 2002).

---

[3] Defendants assert that because Cady has not addressed the dismissal of his breach of warranty claims, these claims are not at issue in this appeal.  Appellees' Br. 4. We note that Cady has clearly challenged the district court's findings regarding his assumption of risk, failure to heed warnings, and product misuse, defenses that applied to and barred his breach of warranty claims.  *See* J.A. 2536-38, 2540.  As we observe in text, however, we need not reach the merits of these contested defenses.  We will therefore address Cady's breach of warranty claims only to the extent necessary to provide a thorough analysis of the dispositive evidentiary issue in this appeal.

[4] It is undisputed that Maryland law governs all the claims at issue.

A district court's decision to exclude expert testimony is reviewed for abuse of discretion. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001). For the following reasons, we cannot conclude that the district court abused its discretion in excluding Ezra's testimony. Accordingly, the grant of summary judgment was proper.

B.

Admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that a witness may submit expert testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Accordingly, expert testimony is admissible under Rule 702 if it (1) involves scientific, technical, or other specialized knowledge and (2) will assist the trier of fact to understand or resolve a factual issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590–91 (1993). The proponent of the testimony must establish its admissibility by a preponderance of the evidence, *Cooper*, 259 F.3d at 199, and the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597).

It is well-established that the Rule 702 inquiry is "flexible" and must be both "tied to the facts of a particular case," *id*. at 150 (internal quotation marks and citations omitted), and "focus[ed] on the 'principles and methodology' employed by the expert[]

10

[rather than] on the conclusions reached," *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted). The district judge "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. We note that although Rule 702 "was intended to liberalize the introduction of relevant expert evidence," this interest must be balanced with the understanding that "expert witnesses have the potential to 'be both powerful and quite misleading.'" *Cooper*, 259 F.3d at 199 (citation omitted). Accordingly, where the expert opinion "has a greater potential to mislead than to enlighten," that evidence "should be excluded." *Westberry*, 178 F.3d at 261 (citation omitted).

Cady's expert, Mark Ezra, is a professional engineer. He opined that the crash was caused by a mechanical failure in the braking system; according to Ezra, defective installation resulted in the brake roller migrating out of place when the van experienced "normal minor chassis flex" and road load, or the force applied to the van by its movements over different surfaces. *See* J.A. 372, 2163. Ezra's testimony primarily relied on two pieces of evidence: his inspections of the van and the logged AEVIT data. During his first inspection of the van, he noted that the brake servo and attached brake roller were "mispositioned relative to the EMC brake pedal extension plate" such that the estimated width of contact between the two was between 1/16 and 1/8 of an inch, which he deemed to be insufficiently narrow. J.A. 2155. During the second inspection, after the van had been moved by a "front end loader equipped with long fork legs," Ezra observed that the brake roller had lost contact with the brake extension plate and was

11

found underneath the OEM brake pedal. J.A. 2162–63. Ezra explained that if the brake roller fell under the brake extension plate when a driver attempted to apply the OEM brake with her foot, the roller would resist the brake and render futile any attempts to use the brake pedal. Ezra asserted that block five of the AEVIT data supported this theory. He noted that in the moments preceding the collision, the van's speed increased from 34 to 37 mph even though the gas/brake controller had called for the brake. Ezra testified that the above increase in speed could be explained only if the brake roller arm had fallen underneath the brake pedal immediately before Cady attempted to brake.

On the Defendants' motions, the district court excluded Ezra's testimony. Although it had "little doubt that Mr. Ezra, in general, has specialized knowledge" to speak on this issue of causation,[5] the court concluded that Ezra "did not have sufficient facts or data" to support his testimony and "did not produce an opinion that was the product of reliable principles and methods." J.A. 2543–44. On appeal, Cady contends that Ezra's opinions were "more than sufficient to satisfy the requirements of Federal Rule of Evidence 702 and *Daubert*." Appellant's Br. 32. The issue before this Court, however, is not whether we would in the first instance admit Ezra's testimony; we are limited to the question of whether the district court abused its discretion in excluding this

---

[5] Defendants assert that "[a]s a threshold matter, and as the district court correctly found, Mr. Ezra is not qualified to give expert testimony in this matter because he has no experience with the specific system involved in this case." Appellees' Br. 41. This is a mischaracterization of the district court's findings. The court observed that Ezra's lack of experience with "the specific system involved in this case" is "of some note," but it clarified that this consideration did not disqualify Ezra's testimony given his general knowledge of drive-by-wire systems in motorcycles. J.A. 2543–44.

expert opinion. Based on the record before us, we must answer this question in the negative.

Certain omissions in Ezra's testimony cast doubt on the reliability of his opinion. Inspections of the van revealed the presence of white residue on the brake pad, which resulted from the white brake roller moving along the steel extension pad. The residue was approximately the same width as the roller, suggesting that the roller arm sufficiently overlapped with the extension pad, had been properly installed, and functioned normally during the two years that Cady owned the vehicle. A smaller amount of overlap over time would have likely resulted in a narrower concentration of white residue. Notably, Ezra did not take this residue into account in his report. Although he admitted seeing the white marks during his inspections of the van, he acknowledged that he did not know what caused the residue, and he did not measure or test the marks.

We also note that Ezra's theory relies on the brake roller losing contact with the brake plate and "dropp[ing] . . . under the brake extension bracket" in the moments preceding the collision, *see* J.A. 2163, but his first post-collision inspection of the van revealed that the roller overlapped with and rested *above* the brake extension plate. Even if one ignored this inconsistency, Ezra's theory relies on the premise that the first observed mispositioning of the brake roller arm (namely, the minimal 1/8 to 1/16 inch overlap with the brake plate from his first inspection) resulted from normal road load and chassis flex and was not itself a product of the collision. To support this proposition, Ezra measured the mid-body chassis rails underneath the van and determined that the passenger compartment of the van had not been deformed or altered by the crash. J.A.

13

1039. Defendants assert that this measurement is immaterial because the brake servo was connected to component parts beyond the passenger compartment — it appears that the brake servo bracket was mounted to the front frame rail inside the engine compartment, which had been deformed on impact. Evidence in the record suggests it was the post-collision bending of this front frame rail that resulted in the brake servo's displacement. *See, e.g.*, J.A. 1489–91, 1500–01, 1680. Ezra's expert testimony does not take these considerations into account, and Plaintiff offered no explanation or rebuttal in his reply brief to Defendants' contentions on this point.

Moreover, despite opining that the minimal force of a "very low road load" could have successfully caused the roller arm to fall off and under the brake pedal, J.A. 377, Ezra was unable to explain why the van experienced this migration in the moments before the collision when it failed to experience any such movement in the preceding two years of its operation. Ezra never tested or measured the amount of flex or road load that an AEVIT-installed Terraza van would normally endure, nor did Ezra identify the nature or extent of forces that would apply to the vehicle under particular sets of circumstances, including the downhill slopes or road quality that the van likely experienced before the crash. The district court certainly acted well within its discretion in factoring all of this into its assessment of the reliability of the Plaintiff's expert opinion evidence.

Nor did the district court abuse its discretion in finding that Ezra's interpretation of the AEVIT data was suspect. As Ezra testified, the speed increase noted above could be explained by the brake roller arm losing contact with the brake extension pad. However, the AEVIT data does not indicate the degree to which the brakes were called

14

for during this time period, and Defendants correctly observe that many different factors, including the downhill slope of the road, could have caused a speed increase even if the brake pedal had been depressed. As we have outlined above, Ezra's analysis does not take into account the road conditions of the van's trajectory preceding the crash, nor does it contemplate or discredit any alternative causes for the crash. It is plausible that human error, inspired by Cady's lack of familiarity with the AEVIT system and his improper "mixed-mode" use of the van, also resulted in ineffective braking — for example, one of Defendants' experts testified that Cady may have mistakenly used the AEVIT hand control calling for acceleration at the same time he pushed the OEM brake pedal with his foot. J.A. 1796–97. The district court could properly weigh heavily in its assessment the fact that Ezra knew of Cady's lack of AEVIT training and "mixed-mode" use of the van, but did not consider and utterly failed to address this potential cause of the collision in arriving at his opinion on proximate cause.

In sum, the district court reasonably concluded that various methodological flaws and omissions collectively cast doubt on the reliability of Ezra's opinion. We are therefore not left with a "definite and firm conviction that the court below committed a clear error" or otherwise abused its discretion when excluding Ezra's expert testimony. *Westberry*, 178 F.3d at 261 (citation omitted). Indeed, this Court has repeatedly affirmed the district court's exclusion of expert testimony where, as here, flaws in the expert's methodology or the expert's failure to adequately address alternative theories undermined the reliability of the opinion. *See, e.g.*, *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911, 914–16

(4th Cir. 2004); *Phelan v. Synthes*, 35 F. App'x 102, 107–08 (4th Cir. 2002); *Cooper*, 259 F.3d at 202–03; *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250–51 (4th Cir. 1999).

Cady asserts that the district court improperly excluded Ezra's testimony based on "the conclusions he generated, not on the principles and methodology he employed in formulating his opinions." Appellant's Br. 43. In so contending, Cady focuses on the district court's statement that Ezra's opinion regarding the irrelevance of Cady's lack of familiarity with the AEVIT system was "inconsistent with the *conclusion* [the court had] reached with respect to contributory negligence and assumption of the risk." J.A. 2544 (emphasis added). This argument improperly isolates the above language and neglects to consider the full scope of the district court's reasoning. Before concluding that Ezra "did not produce an opinion that was the product of reliable principles and methods," the district court explained it was "perplex[ed]" by Ezra's opinion that "a lot of things were not important or not worth testing," including alternative causes for the brake roller arm's observed mispositioning. J.A. 2544. Accordingly, we are persuaded, contrary to Ezra's assertions, that the district court's finding was rooted in Ezra's flawed methodology, not in the content of, or disagreements with, his conclusions.

Cady's final argument contends that the district court's evidentiary ruling is patently arbitrary, and therefore reversible, given that the court allowed the testimony of Defendants' three experts. Cady asserts that Ezra was the most qualified engineer to address the issue of causation, and he argues that Defendants' experts either relied on the same materials as Ezra or based their opinions on less information. Cady concludes that given these considerations, it "defie[d] legal reasoning" to exclude Ezra's testimony

16

while accepting the opinions of Defendants' experts. Reply Br. 15. We discern no irrationality in the district court's approach.

As an initial matter, we note that the correctness of the denial of Cady's motions to exclude the Defendants' experts is not before this Court. Appellant's Br. 11 n.1. More importantly, however, Cady's arguments fail to depict an arbitrary or erroneous application of the law. As we have outlined above, Ezra's opinion was made unreliable by various methodological flaws and omissions, and these concrete concerns regarding the opinion's admissibility are not mitigated by his allegedly superior education or professional background. Moreover, even if Ezra relied on the same materials as the Defendants' experts, it was his apparent failure to analyze or consider relevant information that led the district court to exclude his testimony. Critically, Cady does not point to omissions or flaws in the methodology or underlying principles of the Defendants' expert opinions that should have resulted in their exclusion. Cady's proposed comparison therefore fails to demonstrate a "patently arbitrary application of controlling law." Reply Br. 13 (quoting *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008)).

In light of the above considerations, we conclude that the district court did not abuse its discretion when excluding Ezra's expert opinion evidence.[6] Without this

---

[6] Defendants argue that based on the nature of Cady's arguments, he "has waived any appeal specific to the admissibility of Mr. Ezra's opinions concerning EMC" and has properly preserved only the issue of the opinion's admissibility as to Ride-Away. (Continued)

17

critical evidence on the issue of causation, Cady's claims fail as a matter of law. Accordingly, we must affirm the entry of summary judgment on this basis.

V.

For the reasons set forth above, the judgment is

*AFFIRMED.*

---

Appellees' Br. 1 n.1. Because we affirm the district court's evidentiary ruling and the entry of judgment, we need not address this matter.

DIAZ, Circuit Judge, concurring in the judgment:

I would hold that the district court abused its discretion in excluding the plaintiff's expert witness. In my view, the plaintiff's expert largely used the same data as the defendant's experts, offered reasonable explanations discrediting some alternative theories of the accident, and did not make "wholly conclusory finding[s] based upon his subjective beliefs rather than any valid scientific method," *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001). Thus, the district court's decision to exclude the expert was premised more on the expert's conclusions—and the conflict between those conclusions and the district court's own findings on contributory negligence and assumption of risk—rather than on flaws in the expert's methodology.

Nonetheless, even after considering the plaintiff's expert testimony, I agree with the district court that Cady's assumption of the risk of injury bars any recovery as a matter of law. "The assumption-of-risk doctrine 'is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk.'" *Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014) (quoting *Crews v. Hollenbach*, 751 A.2d 481, 488 (Md. 2000)). Ordinarily, the jury determines "whether a plaintiff knew of the danger, appreciated the risk, and acted voluntarily." *Id.* (quoting *Warsham v. James Muscatello, Inc.*, 985 A.2d 156, 168 (Md. Ct. Spec. App. 2009)). However, "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue [concerning knowledge, appreciation of the danger and voluntariness] is for the court." *Id.* (quoting *Warsham*, 985 A.2d at 168) (alterations in original).

19

At best, the plaintiff's expert testimony in this case suggests that mechanical failure caused the accident.* But this was the same risk Cady assumed when he chose to operate a van that had already malfunctioned, without proper training, and with parts of the AEVIT system disengaged. There were numerous warnings, in both the van and the owner's manual, which cautioned that such actions could lead to steering control failure, injury, or death. Despite these warnings, Cady drove the van, lost control, and got into an accident. His injuries arose from the precise risk he assumed. Indeed, Cady's decision to first test-drive the van in a parking lot, before driving it on the open road, demonstrates his appreciation of the relevant risk.

I therefore concur in the court's judgment.

---

* According to the plaintiff's expert, improper installation caused a brake roller to move out of place as Cady drove the vehicle, resulting in a mechanical failure in the braking system and eventual loss of control. But "[t]his logistical element" of how exactly the loss of control occurred is "not relevant to an assumption of risk analysis, although it might be relevant to a contributory negligence analysis." *C & M Builders, LLC v. Strub*, 22 A.3d 867, 880 (Md. 2011). Under Maryland law, "[c]ontributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs." *Id.* (quoting *Warner v. Markoe*, 189 A. 260, 264 (Md. 1937).